FILED

IN THE UNITED STATES DISTRICT COURT    SEP 1 3 2007
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION    CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEPUTY CLERK

| | | |
|---|---|---|
| TRUETT (BUCK) HUX III, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. SA-07-CA-0133-FB |
| | § | |
| CIT FINANCIAL USA, INC. d/b/a | § | |
| LEASE FINANCE GROUP and LEASE | § | |
| FINANCE GROUP, LLC, | § | |
| | § | |
| Defendants. | § | |

## ORDER CONCERNING MOTION TO COMPEL ARBITRATION

Before the Court are: (1) Defendants' Motion to Compel Arbitration, to Stay This Proceeding

or in the Alternative, To Dismiss for Improper Forum; (2) Plaintiff's Response to Defendants'

Motion to Compel Arbitration, to Stay This Proceeding or in Alternative, to Dismiss for Improper

Forum; (3) Defendants' Reply in Support of Their Motion to Compel Arbitration;  (4) Plaintiff's

Objection to Defendants' Reply in Support of Their Motion to Compel Arbitration and Motion for

Leave to Amend Plaintiff's Response to Defendants' Motion to Compel Arbitration, to Stay This

Proceeding or in the Alternative, to Dismiss for Improper Forum; (5) Plaintiff's Evidentiary

Objections to Defendants' Reply in Support of Their Motion to Compel; and (6) Plaintiff's Motion

for Leave to File a Sur Response to Defendants' Reply in Support of Their Motion to Compel

Arbitration.  Defendants maintain this proceeding must be stayed and the parties ordered to

arbitration, or in the alternative, the case must be transferred to Illinois because of the forum

selection clause contained in the lease.  Plaintiff contends the Court cannot compel arbitration until

it first determines there is a valid agreement to arbitrate, and plaintiff denies such an agreement

exists.

### *Facts*

Plaintiff alleges in his complaint, that on January 11, 2005, he was approached by a representative of the defendant concerning an offer to lease equipment to be used for credit card service. Plaintiff states he agreed on that date to accept the service provided by the defendant "if and only if" defendant provided the necessary equipment and service prior to January 22, 2005. Plaintiff was assured by the defendant's representative that the deadline would be met. Relying on these assurances, plaintiff signed the Lease Agreement on January 11, 2005.

The defendant failed to provide the requisite equipment and service by the plaintiff's January 22, 2005 deadline. Plaintiff states he communicated to defendant's representative that the conditions of his acceptance had not been met, and plaintiff would not accept or use the equipment or service provided under the lease. Despite this communication, defendant shipped the equipment to plaintiff, but plaintiff refused delivery. The delivery service, DHL, returned the equipment to the defendant.

Despite the return, plaintiff alleges the defendant disregarded his refusal and return of the equipment and began to charge him for the services provided under the lease. Plaintiff asserted the lease was not an enforceable contract and refused to pay for the service; defendant began sending collection notices to plaintiff. On or about July 1, 2005, defendant notified credit reporting agencies that plaintiff owed money and submitted plaintiff's account for collection. The notice of collection was added to plaintiff's credit report, which plaintiff did not know until October 23, 2005. Plaintiff states he had applied for multiple loans or lines of credit to purchase property in Comal County, Texas, but as a result of the collection notice on his credit report, he was unable to obtain suitable financing. Plaintiff asserts causes of action for defamation, libel per se, defamation per se, and business disparagement.

### *Motion to Compel Arbitration or Dismiss for Improper Forum*[1]

In their motion to compel arbitration, defendants contend the lease agreement between the parties contains a valid and enforceable arbitration agreement as well as a mandatory forum selection clause for arbitration in Chicago, Illinois. The clauses at issue from the Non-Cancellable Lease Agreement attached by the defendants to the motion to compel as Exhibit 2 read as follows:

20. MISCELLANEOUS. In the event you fail to comply with any provision of the Lease, we shall have the right, but not be obligated to effect such compliance on your behalf. All monies expended by us in effecting such compliance shall be deemed to be additional rent, and shall be paid by you to us at the time of the next monthly payment or rent. All notices under this Lease shall be sufficient if given personally or mailed to the party intended at the respective address set forth herein, or at such other address as said party may provide in writing from time to time. We intend and you intend the Lease to be a valid and subsisting legal instrument, and agree that any provision of this Lease which may be deemed unenforceable shall be modified to the extent necessary to render it enforceable and shall in no way invalidate any other provision or provisions of this Lease, all of which shall remain in full force and effect. This Lease shall be binding when accepted in writing by us and shall be governed by the laws of the State of Illinois, without regard to the conflict of law rules or principles thereof. Unless otherwise prohibited by law you agree and consent that the Court of the State of Illinois having jurisdiction in Cook County or any Federal District Court having jurisdiction in Cook County shall have the jurisdiction and shall be the proper venue for the determination of all controversies and disputes arising hereunder. You agree and consent that service or process by registered or certified mail will be sufficient to obtain jurisdiction. Nothing contained herein is intended to preclude us from commencing any action hereunder in any court having jurisdiction thereof. YOU WAIVE, INSOFAR AS PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION BETWEEN THE PARTIES.

21. CHOICE OF LAW; ARBITRATION. Any unsettled claims or controversy, including any contract or tort claim between or among us, you or any Guarantor related to this Lease, shall be determined by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association or if you choose, the rules of Arbitration (Binding) of the Better Business Bureau. All statutes otherwise applicable shall apply. Judgment upon the arbitration award may be entered in any court having jurisdiction.

---

[1] Defendants do not urge their motion to dismiss for improper forum pursuant to rule 12(b)(3) of the Federal Rules of Civil Procedure in favor of staying the proceedings and compelling arbitration.

> In event [sic] you or Guarantor Defaults, these provisions regarding arbitration shall not apply to our right to repossess the Equipment. This Lease is made in interstate commerce. Any arbitration shall take place in Chicago, Illinois.

Based on these clauses, defendants contend "to the extent that Plaintiff wishes to challenge either the contract or the arbitration agreement, this is an improper forum to assert those claims." Moreover, because plaintiff's claims arise directly out of and/or relate to the Lease Agreement, this proceeding must be stayed and the parties ordered to mediation.

In response, plaintiff maintains he revoked his acceptance of the proposed lease, the defendant CIT disregarded the revocation and sent the equipment to plaintiff via DHL, and plaintiff refused delivery of the equipment. In addition, plaintiff notes the proposed lease was not signed by defendant CIT until March 15, 2005, which was after CIT had been notified of plaintiff's revocation. Plaintiff contends that based on the language of the proposed lease, the proposed lease could not be a binding contract until defendant CIT had accepted it in writing. Because plaintiff revoked his acceptance prior to CIT's acceptance on March 15, 2005, neither a contract nor an agreement to arbitrate was formed. Also, because there is no contract, the parties also never agreed to a particular forum. Plaintiff believes the decision in Will-Drill Resources, Inc, v. Samson Resources Co., 352 F.3d 211 (5th Cir. 2003), supports his position.

In reply, defendants contend that Will-Drill is distinguishable because in that case, the court found a contract never existed at all which is not the case here. Here, the parties reached an agreement, but plaintiff claims he later revoked his acceptance of that agreement, allegedly before defendants accepted the lease in writing. Defendants state the plaintiff neither alleges nor proves he actually communicated his revocation to the defendants before they accepted the lease or before both

parties subsequently performed under the lease.  That defense demonstrates the parties had at one

point reached an agreement which "provides the arbitrator with the authority required to decide

whether the agreement will continue to exist." Defendants' Reply, docket #9 at page 2 quoting Will-

Drill, 352 F.3d at 219.  Defendants additionally note the lease contains plaintiff's unconditional

acceptance on the first page and bars parole evidence under the UCC.  Although plaintiff claims he

unilaterally "revoked" the lease in January of 2005, defendants claim plaintiff or one of his

employees later verified delivery and acceptance via telephone on March 7, 2005, followed by eight

consecutive monthly payments beginning in April of 2005.  These actions occurred after plaintiff

concedes defendants accepted the lease in writing on March 15, 2005.    In Will-Drill, the parties

never took the initial step to form a contract and therefore, the arbitrator never had authority to

decide a dispute. Here, plaintiff signed the agreement, the defendants signed the agreement, and both

parties performed under the agreement for eight months after defendants' written acceptance.

Relying on Primerica Life Ins. Co. v. Brown, 304 F.3d 469, 472 (5th Cir. 2002), defendants argue that

"[a]ssertions of contractual defenses do not question the 'making of an agreement to arbitrate,' but

instead assert reasons why the contract should be voided or not enforced. . . . those questions are for

the arbitrator, not this Court." Defendants' Reply (docket #9) at page 5.

        In addition to plaintiff's actions evidencing acceptance and performance under the lease,

defendants contend the law also precludes plaintiff from unilaterally revoking the contract.

Defendants refer to the lease contract in which it is stated, inches above plaintiff's signature, that

plaintiff shall be deemed to have unconditionally accepted," and two inches above plaintiff's

signature the wording that the contract is "non-cancellable," and that "NOTWITHSTANDING ANY

AMOUNTS WHICH MAY BE PAID BY LESSOR TO VENDOR OR ANY AGENT OR

VENDOR, LESSEE UNDERSTANDS AND AGREES THAT NEITHER VENDOR NOR ANY AGENT OF VENDOR IS AN AGENT OF LESSOR OR IS AUTHORIZED TO WAIVE OR ALTER ANY TERM OR CONDITION OF THIS LEASE. THEIR REPRESENTATIONS SHALL IN NO WAY AFFECT LESSEE OR LESSOR'S RIGHTS AND OBLIGATIONS AS HEREIN SET FORTH."   Defendants claim the foregoing language coupled with the UCC"s prohibition on unilateral termination of security agreements and the exclusion of parole evidence does not allow for a unilateral revocation by plaintiff of the lease as he claims.

Moreover, this Court's review, according to the defendants, is limited strictly to deciding whether a contract ever existed at any point in time and not to weigh the strengths or weaknesses of either of the parties' claims or defenses to the contract.  Defendants believe the plaintiff is asking this Court to violate that rule and become involved in deciding whether his unilateral revocation of the lease is valid in order to avoid the arbitration clause contained in the lease.  Defendants claim that if this Court finds the lease was unilaterally revoked, it would be rendering a judgment on the merits of plaintiff's case in chief and if it rules to the contrary, it would be ruling on defendants' case in chief.  The Court under defendants' analysis cannot do either.  Defendants contend whether plaintiff is ultimately able to withdraw his consent and whether his revocation was legally effective to terminate the lease are all issues for decision by the arbitrator and not this Court.  To do so would be an impermissible peremptory ruling on the merits of the case.

Attached to defendants' reply is the affidavit of Lina Kravic who is employed as the Originations Manager for Lease Finance Group, LLC (LFG).  She explains how LFG operates in that it "is an equipment finance lessor specializing in the lease financing of electronic point-of-sale equipment," and provides an overview of how transactions, such as the one at issue herein, take form, and specific information about the particular transaction between the parties herein:

LFG's lease transactions are generally initiated by a third-party equipment vendor or supplier ("vendor"). The vendors are completely separate and independent of LFG. The vendors maintain their own sales offices, if any, and are not controlled or owned by LFG in any manner and usually maintain non-exclusive relationships with LFG.

A merchant desirous of obtaining equipment for its business may purchase the equipment outright from the vendor. As an alternative, the merchant may elect to lease the equipment. In the latter scenario, the vendor may apply to LFG for lease financing, and upon LFG's approval, LFG will purchase the equipment from the vendor and lease the same to the merchant subject to the terms of a finance lease agreement between LFG and the merchant.

On January 11, 2005, plaintiff Truett Hux III entered into and executed a Non-Cancellable equipment finance lease agreement ("Lease Agreement:) with LFG for credit card processing equipment for his Rough & Ready place of business (although the lessee's legal name is identified as Truett Hux III"). A true and correct copy of the Lease Agreement is annexed hereto as "Exhibit A."

The Lease Agreement also contains plaintiff's separately executed personal guarantee of all payments due thereunder.

The Lease Agreement provides for plaintiff to make basic monthly lease payments to LFG in the amount of $49.99, plus applicable taxes and an insurance non-compliance fee of $2.50, for a term of forty-eight (48) months via Automatic Clearing House (ACH) electronic debits to plaintiff's bank account as set forth on the face of the Lease Agreement. The Lease Agreement contains the lessee's bank account and routing numbers for these purposes.

Plaintiff selected the equipment from Concord EFS, Inc. ("Concord") an independent vendor of point-of-sale equipment and merchant credit card processing services.

As part of LFG's origination process, prior to accepting and funding a lease transaction, the lease must still be verified through direct telephonic communication with the lessee or by obtaining a signed delivery receipt from the lessee to ensure that the equipment has been delivered to and accepted by the lessee.

Attached hereto as "Exhibit B" is a true and correct copy of a Concord Installation Report from LFG's books and records, dated March 7, 2005, LFG obtained from plaintiff indicating that the leased equipment had been delivered and installed. [The Concord Installation Report has been stricken from the record herein.]

On March 15, 2005, LFG paid Concord for the equipment in the total amount of $1,899.94 and executed the Lease Agreement.

Thereafter, Plaintiff proceed [sic] to make eight (8) consecutive monthly lease payments due LFG pursuant to the terms of the Lease Agreement commencing April 15, 2005, thru November 15, 2005 *without issue.*  A true and correct copy of a payment history for this lease from LFG's books and records is annexed hereto as Exhibit C.

Attached hereto as Exhibit D is a true and correct copy of a computerized communication log from LFG's books and records reflecting each and every communication LFG had with plaintiff in connection with this lease.

The comment log reflects that the first communication LFG had with plaintiff since the lease's inception was on December 21, 2005. That attempted communication and numerous subsequent attempts were initiated by LFG in an attempt to contact plaintiff to resolve the payment delinquency after not receiving plaintiff's lease payment on December 15, 2005. After LFG left a number of phone messages which were not returned by plaintiff, LFG finally spoke with plaintiff on January 10, 2006. On that telephone call, plaintiff advised that he will not be making further payments because he was not satisfied with the equipment. Two days later, on January 12, 2006, LFG spoke with plaintiff who then for the first time advised that he allegedly never received the equipment and that his attorney would now be handling the lease account.

At no point prior to January 1, 2006, *more than one year* after plaintiff executed the Lease Agreement, ***and more than ten months*** after LFG obtained written confirmation of the delivery and installation of equipment, did plaintiff ever advise, whether in writing or orally, that he had not received the equipment or that he was unilaterally attempting to rescind his entry into, or otherwise to cancel, the Lease Agreement.

(Emphasis in original, paragraph numbers omitted).

In response to defendants' reply, plaintiff objects to the timeliness of defendants' reply and asks the reply be stricken, seeks to file an amended response if defendants' reply is allowed to remain, and asserts evidentiary objections to defendants' reply which the Court has addressed previously. Although plaintiff is correct in noticing that the defendants' reply was filed untimely, the Court will not strike the filing. However, the Court will grant plaintiff leave to file his first amended response to defendant's motion to compel arbitration. Accordingly, IT IS HEREBY

ORDERED that Plaintiff's Objection to Defendants' Reply is DENIED and Plaintiff's Motion for

Leave to Amend Plaintiff's Response to Defendant's Motion to Compel (docket #10) is GRANTED.

The Court will review and consider Plaintiff's First Amended Response to Defendants' Motion to

Compel Arbitration, to Stay this Proceeding or in the Alternative, to Dismiss for Improper Forum

(docket #11).

In Plaintiff's First Amended Response to Defendants' Motion to Compel Arbitration, to Stay

this Proceeding or in the Alternative, to Dismiss for Improper Forum, plaintiff attaches his affidavit

in support of his response.  Plaintiff acknowledges he is the president of TP Hux, Inc. d/b/a Rough

& Ready Outfitters, a retail business located in Whitehouse, Texas.  Mr. Hux further avers as

follows:

> On January 11, 2005, I was approached by an individual (name unknown) soliciting
> leases for credit card processing equipment on behalf of CIT Financial USA, Inc.
> d/b/a Lease Finance Group.
>
> On January 11, 2005, I signed the proposed lease, a copy of which is attached hereto
> as Exhibit 1 (hereinafter referred to as the "Proposed Lease");
>
> The Proposed Lease contains an arbitration provision;
>
> I agreed to the terms of the Proposed Lease based upon the guarantee of the soliciting
> individual that the equipment would be provided by January 22, 2005, the date of the
> Grand Opening of Rough & Ready Outfitters;
>
> The soliciting individual guaranteed that the equipment would be provided by
> January 22, 2005;
>
> Defendants did not provide the equipment prior to January 22, 2005.
>
> After January 22, 2005, and prior to January 26, 2005, I contacted the soliciting
> individual and advised that I was revoking my acceptance of the Proposed Lease;
>
> At the time of my revocation, the Proposed Lease had not been accepted by
> Defendants;

On January 26, 2005, I contracted with another company, Ladco Leasing, to obtain credit card processing equipment on similar terms as the Proposed Lease (see the Lease Agreement with Ladco Leasing which is attached hereto as EXHIBIT 2 (hereinafter referred to as the "Ladco Lease"));

On a date between January 22, 2005, and March 15, 2005, Defendants attempted to deliver equipment to Rough & Ready Outfitters by DHL delivery service;

I refused delivery of the equipment from DHL delivery service;

I never possessed the equipment that Defendants attempted to deliver;

I do not currently possess the equipment that Defendants attempted to deliver;

The Proposed Lease contains a provision in paragraph 2 that states "this lease shall be binding when accepted in writing by us";

The Proposed Lease identifies the Lessor as CIT Financial USA, Inc. d/b/a Lease Finance Group;

The Proposed Lease was not signed by a authorized agent of CIT Financial USA, Inc. d/b/a Lease Finance Group until March 15, 2005;

I have reviewed the "Installation Report" dated March 7, 2005 (hereinafter referred to as the "Installation Report"), a copy of which is attached hereto as EXHIBIT B;

Neither my handwriting nor my signature appear on the Installation Report;

The Installation Report does not state the name of the person contacted by Defendants for purposes of completing the Installation Report;

The Installation Report notes that the phone number called was (903) 839-0987 which is the telephone number for Rough & Ready Outfitters;

I did not speak to Defendants' representative regarding the information contained in the Installation Report;

To the best of my knowledge, none of my employees communicated with Defendants' representative regarding the information contained in the Installation Report;

I could not have been contacted at (903) 839-0987 on March 7, 2005;

-10-

I was not present on site at Rough & Ready Outfitters from March 4, 2005, through March 16, 2005;

I have never confirmed installation of equipment pursuant to the Proposed Lease;

I have never informed Defendants' [sic] that I would not pay because I was "not happy with the equipment;"

I have never "made payments" under the terms of the Proposed Lease;

I have never written a check to Defendants for payment under the terms of the Proposed Lease;

Defendants' [sic] withdrew $58.79 from my account, without my knowledge or consent, for eight months beginning in April 2005 and ending in November 2005;

When I became aware of the unauthorized withdrawals, I obtained a stop payment order from my bank to prevent the unauthorized withdrawals;

The Proposed Lease never constituted a binding contract.

Based on both the affidavits presented, there appears to be no dispute of the signature dates of each party.  The dispute appears to center on whether a contract ever existed - plaintiff believing his revocation of the contract prior to acceptance by the defendants prevented the contract from becoming binding or ever existing, and defendants believing an agreement had been reached and plaintiff's later alleged revocation merely a defense to that agreement.  The parties both also appear to agree that the decision in Will-Drill Resources supports their respective positions.

In Will-Drill, Will-Drill Resources, Inc. offered to sell mineral leases and related assets. Will-Drill Resources, Inc. v. Samson Resources Co., 352 F.3d 211, 213 (5th Cir. 2003).  An oil and gas company interested in purchasing these leases and assets, Samson Resources Co., sought permission to review the proprietary information about the properties and entered into a Confidentiality Agreement with Will-Drill to do so.  Id.  Samson reviewed the information and

presented Earnest Nix, a representative owner, a proposed sale agreement (PSA) offering to buy all of the sellers' properties. Id. Samson signed the PSA which included signature lines for each seller and an arbitration clause.

Samson was later contacted by Mr. Nix and informed that eight of the sellers included on the PSA signature page decided not to sell their properties at the offered price but four new sellers wanted in on the deal. Samson responded by withdrawing the PSA and notifying Mr. Nix of its withdrawal. Id. Samson believed that because the PSA was an offer to buy all of the properties listed, Samson's offer was rejected when all signatures were not obtained and a counteroffer was being made by Mr. Nix which Samson rejected. Samson further believed that no contract existed because the PSA required all parties' signatures before a legally binding agreement was made. Id.

Specific performance was sought by Will-Drill and several of the sellers who had signed the PSA in their suit against Samson. Id. In an amended complaint, Will-Drill and the sellers sought to invoke the arbitration clause contained in the PSA. The plaintiffs sought by motion to compel arbitration. The United States Magistrate Judge who reviewed the case determined the issue of whether the PSA was an enforceable contract was for the arbitrator to decide and not the court. The district court accepted the recommendation and ordered the case to arbitration, and Samson appealed. Id. at 214.

On appeal, de novo review is applied to the decision to grant or deny a motion to compel arbitration. Id. In determining whether the parties should be compelled to arbitration, a two-step inquiry is made. The court must first determine "'whether the parties agreed to arbitrate the dispute,'" and if so, the court must next determine "'whether any federal statute or policy renders the claims nonarbitrable.'" Id. (quoting R.M. Perez & Assocs., Inc. V. Welch, 960 F.2d 534, 538 (5th

Cir. 1992)).  The court applies ordinary contract principles in determining whether an agreement to arbitrate exists.

Before deciding the issue in <u>Will-Drill</u>, the court provided an extensive explanation concerning arbitration.  The court noted:

> Will-Drill argues that the separability doctrine articulated in <u>Prima Paint</u>, as recently applied by this court in <u>Primerica</u>, required the district court to order arbitration.  In <u>Primerica</u>, the plaintiff resisted arbitration, claiming he lacked the mental capacity to execute a contract under Mississippi law, and therefore the contract containing an arbitration clause which he signed was void and the court could not order arbitration. Applying the separability doctrine, we held that because the capacity defense was directed at the contract generally and not a specific challenge to the arbitration clause, the capacity defense must be submitted to arbitration along with the rest of the dispute between the parties.  We stated the separability principle in broad terms: "[U]nless a defense relates specifically to the arbitration agreement, it must be submitted to the arbitrator as part of the underlying dispute.
>
> Samson argues the <u>Prima Paint</u> does not apply here, even though Samson's argument that all of the sellers' signatures were required for the formation of the contract is directed at the making of the contract generally, rather than the arbitration clause specifically.  Samson characterizes its argument as challenging the very existence of a contract, rather than a defense to an existing contract which it seeks to have declared void or voidable.  Samson notes that it is for the courts, and not an arbitrator, to decide whether less than all of the sellers' signatures constitutes acceptance of the offer and the creation of a contract.  Where no contract exists, there is no agreement on anything, including an agreement to arbitrate.

<u>Id.</u> at 214-15 (footnotes containing citations omitted).  The court found some of its precedent supported Samson's arguments and explained as follows:

> In <u>Jolley v. Welch</u>, investors brought suit against their stockbroker and brokerage firm.  The brokerage firm moved to submit the claims against it to arbitration, and an issue arose about the possible forgery of the plaintiffs' signatures on forms containing the arbitration clause.  The forgery issue was referred to the magistrate judge "for an evidentiary hearing on which, if any, of the original arbitration agreements bear legitimate signatures, and which, if any, are forgeries.  The brokerage firm argued that the district court erred in referring the forgery issue to the magistrate judge because under <u>Prima Paint</u>, "a claim of fraud in the inducement of the contract generally, as opposed to fraud in the inducement of the arbitration clause, may not be passed on by a federal court."

We held that, "'the first task of a court asked to compel arbitration of a dispute *is to determine whether the parties agreed to arbitrate that dispute.*'" Because the brokerage firm declined to introduce an agreement signed by one of the plaintiffs, we concluded that "the district court accordingly had no opportunity to reach even its 'first task,'" and therefore the district court did not err in refusing to order arbitration of that plaintiff's claim. Although not explicitly stated in the opinion, we implicitly rejected the argument that the forgery issue should have been presented to the arbitrator, and was improperly before the district court.

Similarly, in <u>Fleetwood Enterprises, Inc. v. Gaskamp</u>, we refused to order arbitration of a dispute where one of the parties claimed that it was not bound by the entire agreement, including the arbitration clause. In <u>Gaskamp</u>, the parents brought suit against the manufacturer of their mobile home on behalf of themselves and as next friend of their minor children for injuries sustained from exposure to toxic fumes present in their new mobile home. The manufacturer tried to compel arbitration, based on an arbitration clause in the sales agreement signed by the parents. The parents resisted arbitration of their children's claims, arguing that the children were not bound by the arbitration clause because the children did not sign the agreement. We turned to Texas law to determine "whether there [was] a valid agreement to arbitrate" between the children and the manufacturer, and concluded that under Texas law, the children were not bound by their parents' signatures. Even though the existence of the entire agreement, and not just the arbitration clause, was at issue, we did not send the issue to the arbitrator. We stated the basic principle that it is for the courts to decide whether the parties have agreed to arbitrate, and that "[t]his determination is generally made on the basis of 'ordinary state-law principles that govern the formation of contracts.'"

<u>Id.</u> at 215-15 (emphasis in original; footnotes containing citations omitted).

The court went on to recognize the same conclusions have been reached by sister circuits in their refusal to order arbitration "where one party claims that it is not bound by the arbitration agreement, either because it was not an original party to the agreement, its signature was forged, or because the person signing on its behalf was acting outside the scope of his authority and thus the party is not bound by the signature." <u>Id.</u> at 216. The attack in all of these cases focused on the existence of the entire contract and not the specific arbitration clause. The court also noted the refusal to compel arbitration in situations where a party contends no agreement existed because that party never signed the contract is consistent with Supreme Court precedent.

-14-

In finding the case law discussed presents two principles which are "in tension," the court explained:

> First, it is clear that because arbitration is a matter of contract, where one party contends that it has not signed any agreement to arbitrate, the court must first determine if there is an agreement to arbitrate before any additional dispute can be sent to arbitration. We agree with those circuits which have included claims that the signature is forged or the agent lacked authority to bind the principle in this category. On the other hand, where parties have formed an agreement which contains an arbitration clause, any attempt to dissolve that agreement by having the entire agreement declared voidable or void is for the arbitrator. Only if the arbitration clause is attacked on an independent basis can the court decide the dispute; otherwise, general attacks on the agreement are for the arbitrator.

> This case lies between these principles. Samson is attacking the very existence of any agreement. On the other hand, we have before us a document signed by all parties wishing to enforce it, as well as the party refusing arbitration. Its validity is being attacked on a basis that is directed at the agreement in general, rather than the arbitration clause in particular. We base our answer on the fundamental principle that arbitration is a matter of contract which cannot be forced upon a party absent its consent. Where the very existence of any agreement is disputed, it is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract.

> We reject the argument that where there is a signed document containing an arbitration clause which the parties do not dispute they signed, we must presume that there is a valid contract and send any general attacks on the agreement to the arbitrator. The base point to which the analysis inevitably returns is that the separability doctrine rests on the assumption that there is an underlying agreement. That one of the parties later disputes the enforceability of that *agreement* does not change the fact that at some point in time, the parties reached an agreement, and that agreement included the decision to arbitrate disputes arising out of the agreement. The existence of this agreement provides the arbitrator with the authority required to decide whether the agreement will continue to exist. Even if the arbitrator concludes that the agreement was void, and the parties are returned to their pre-agreement positions *as if* the agreement never existed, the agreement existed long enough to give the arbitrator the power to decide the dispute.

> In contrast, where the very existence of an agreement is challenged, ordering arbitration could result in an arbitrator deciding that no agreement was ever formed. Such an outcome would be a statement that the arbitrator *never* had any authority to decide the issue. A presumption that a signed document represents an agreement

> could lead to this untenable result. We therefore conclude that where a party attacks
> the very existence of an agreement, as opposed to its continued validity or
> enforcement, the courts must first resolve that dispute.

Id. at 218-19 (footnotes containing citations omitted, emphasis in original). In reaching this holding,

the court noted consistency with its previous decision in Mesa Operating Ltd. Partnership v.

Louisiana Intrastate Gas Corp., 797 F.2d 238 (5th Cir. 1986). In that case, the party seeking to avoid

arbitration claimed the entire agreement was illegal and thus void *ab initio*. Will-Drill, 352 F.3d at

219. In ordering the parties in Mesa to arbitrate their dispute, the court found an agreement to

arbitrate had been reached because both sides had performed the contract for about two years and

therefore the challenge "was to the continued viability of the agreement, rather than its very

existence." Id.

The court also admitted it was being forced to make a fine distinction which no doubt would

be elusive on occasion. Id. They found Samson was attacking the very existence of an agreement

and not the continued validity of an existing agreement. Although the court refused to address the

merits of Samson's claim other than to note that the district court would have to resolve that dispute,

the district court's order compelling arbitration was vacated and the case remanded for further

proceedings consistent with the opinion. Id. at 220.

Here Mr. Hux, like Samson, is attacking the very existence of an agreement based on his

alleged rescission of the contract prior to defendant's acceptance while defendants claim a contract

was formed and its continued viability is being challenged. Based on Will-Drill Resources, Inc. v.

Samson Resources Co., 352 F.3d 211 (5th Cir. 2003), this Court's only task at this time is to

determine whether an agreement/contract was formed between the parties. In order to make that

determination, the Court requested further briefing/evidence from the parties. The plaintiff was

ordered to file additional briefing and evidence corroborative of his alleged revocation/rescission of the contract by his contact with the soliciting individual (name unknown) referenced in his affidavit. Plaintiff was ordered to provide the name of the company the unknown soliciting representative represented as well as any other evidence he may have concerning his alleged revocation/rescission of the agreement and the alleged rejection of delivery by DHL. Defendants were ordered to file additional briefing and evidence corroborative of the alleged installation by Concord EFS, Inc. and alleged delivery by DHL. Briefs from both parties have been received.

### *Plaintiff's Additional Briefing on Motion to Compel*

Despite a diligent search by the plaintiff of his records, plaintiff states he has not located any document related to the "soliciting individual's" identity. Plaintiff believes the soliciting individual was an employee or agent or representative of defendant CIT, but again, has not located any documentation identifying the soliciting individual's employer.

Plaintiff claims that on January 22, 2005, he relied on this soliciting individual's actual authority and effectively revoked his offer by advising the soliciting individual, who came in to Rough & Ready Outfitters and advised the plaintiff the equipment would not be installed on time, he was no longer willing to be bound by the terms of the proposed lease. On Monday, January 24, 2005, plaintiff states he contacted another leasing company and entered into a lease similar to the one at issue herein and that company made delivery of equipment to his place of business some time between January 26, 2005 and February 4, 2005. Plaintiff also maintains that some time between January 22, 2005 and March 15, 2005, DHL Delivery Service attempted to deliver equipment to the plaintiff at Rough & Ready Outfitters but that delivery was refused. Plaintiff unfortunately has been unable to locate any information regarding the refused shipment but reasserts that he has never been in possession of or used the defendants' equipment.

-17-

Plaintiff argues the defendants have the burden of proving the agreement to arbitrate and have failed to offer clear and unmistakable evidence of that agreement herein.  Defendants have failed to prove (1) an offer, (2) an acceptance, (3) mutual assent, (4) execution and delivery of the contract with the intent that the contract be mutual and binding, and (5) consideration supporting the contract.  Although plaintiff admits he argued previously he had "revoked his acceptance" of the proposed lease before it became a binding contract, plaintiff acknowledges now he "unartfully" worded his position and it is better described as a revocation of his willingness to be bound by the proposed lease because plaintiff was, in fact, the offeror.

Plaintiff points out the lease provision which states the "lease shall be binding when accepted in writing by us" vested the power of acceptance with defendant CIT.  Therefore, to establish the proposed lease became a binding contract, plaintiff believes the defendants must prove they accepted plaintiff's offer, and defendants have failed to offer clear and unmistakable evidence of acceptance prior to plaintiff's revocation.  Plaintiff contends the revocation he communicated to the soliciting individual on January 22, 2005, extinguished defendants' power of acceptance.  Because the soliciting individual had authority to facilitate the formation of lease contracts on behalf of the defendants, plaintiff maintains it logically follows the soliciting individual also had the implicit authority to receive and transmit notice that the offer had been revoked.  Therefore, notice to the soliciting individual on January 22, 2005, had the same effect as a direct communication to the defendants.

Alternatively, plaintiff argues if the Court finds actual authority did not exist, the soliciting individual was clothed with apparent authority.  Again, plaintiff notes it is undisputed the soliciting individual had actual authority to solicit offers on the defendants' behalf.  Moreover, plaintiff had no contact with any other individual associated with the defendants concerning the proposed lease.

-18-

As a result, it was natural and reasonable for the plaintiff to believe the soliciting individual had authority, actual or apparent, to receive plaintiff's revocation, and his notice of revocation to the soliciting individual is equivalent to notice directly to the defendants.  Regardless of whether the Court finds the soliciting individual had actual or apparent authority, the revocation destroyed defendants' power of acceptance and prevented the formation of a contract.

Plaintiff anticipates the defendants will likely point to the provision in the lease that stated that the "lessee understands and agrees that neither vendor nor any agent of vendor is an agent of lessor or is authorized to waive or alter any term or condition of this lease."  Plaintiff contends this provision simply notifies the parties the vendor does not have authority to alter any of the terms of the proposed lease.  If defendants argue the soliciting individual had no authority whatsoever, the soliciting individual also would have no authority to receive plaintiff's offer and if he had no authority to receive the offer, no offer was ever conveyed so no contract could ever be formed.  Plaintiff maintains defendants must decide whether the vendor had authority but cannot have it both ways - the vendor either had authority to accept and revoke offers or no authority at all.

In addition to the verbal revocation, plaintiff contends his refusal of the delivery of the equipment was an act inconsistent with the offer of which the defendants were aware.  This refusal prior to defendants' acceptance is sufficient to revoke the plaintiff's offer.  Alternatively, plaintiff maintains that even though the defendants signed the proposed lease, they never delivered a writing indicating such acceptance to the plaintiff nor did they communicate in any form their acceptance of the proposed lease to the plaintiff.  Without this notice, a binding contract between these parties could not be formed.

### _Defendants' Additional Briefing on the Motion to Compel Arbitration_

Although the Court specifically requested to defendants to "file additional briefing and evidence corroborative of the alleged installation by Concord EFS, Inc. and alleged delivery by DHL," defendants choose only to respond to the plaintiff's additional briefing.  In their response, defendants note the undisputed facts are: (1) there is a signed agreement between the parties; (2) the signed agreement contains an arbitration clause; (3) plaintiff was the offeror in the creation of the agreement; (4) CIT accepted plaintiff's offer, and (5) CIT tendered performance to the plaintiff between January 22 and March 15, 2005.  Despite these facts, plaintiff seeks to set aside the agreement by claiming: (1) he revoked his offer before it was accepted even though any words of revocation were told to a person that was not CIT's agent or (2) CIT did not send a formal notice of acceptance but tendered the equipment instead.  Defendants maintain arbitration should be ordered in this case because: (1) plaintiff cannot show he revoked his offer; (2) where the offeror does not specify the form of notice for acceptance, an offeree's tender of performance, in this case the delivery of the equipment, should be an adequate substitute for the sending of notice; and (3) CIT accepted plaintiff's offer within a reasonable time.

Defendants argue that for plaintiff to prove his purported revocation was effective, he bears the burden of proving an agent of CIT received notice of his revocation prior to acceptance by CIT.  The only person to whom this notice was communicated was the soliciting individual, and plaintiff has offered no proof this person was an agent for CIT.  Plaintiff has failed to offer any evidence of express or apparent authority and has failed in his burden to prove the existence of an agency relationship.

With respect to defendants' acceptance, defendants argue the UCC contemplates an offeree's commencement of performance operates as acceptance if the offeror is notified of acceptance within a reasonable time.  Here, notice of CIT's acceptance of the lease agreement was received by the plaintiff when the equipment was delivered.  Defendants contends that "[e]ven if the delivery is not a technical acceptance under the terms of the offer, the UCC recognizes situations in which a contract is formed by delivery of the equipment."  Here, CIT began performance by shipping the equipment, the shipping constituted notice to plaintiff of CIT's acceptance, and plaintiff no longer could revoke his acceptance.  CIT would not have shipped the equipment had it not accepted the plaintiff's offer.

CIT also asserts its acceptance, albeit not until March 15, 2005, was timely.  The UCC and common law allow an offeree to accept the offer within a reasonable time where the offer does not specify an acceptance date.  Here plaintiff's offer was silent, and as set forth in the affidavit attached to defendants' response, the industry standard for equipment leasing is 30 to 90 days between the time of offer, delivery and acceptance.  Although plaintiff asserts he advised the soliciting individual he needed the equipment by January 20, 2005, plaintiff failed to include that term in his offer to CIT, and this statement as well as any others are barred by the parole evidence rule as well as the integration clause contained in the lease.

The Court finds the defining legal issue is the law of agency.  Credibly and undisputedly, Mr. Hux tells the Court his attempted revocation was to an unknown individual in the employ of EFS National Bank, the manufacturer or distributor of the equipment commonly referred to as the

-21-

vendor.[2] There is no evidence, as opposed to allegations, that defendant CIT did anything to clothe an employee of another company with actual or apparent agency authority to receive and convey information from plaintiff Hux to defendant CIT. <u>Wells Fargo Business Credit v. Ben Kozloff, Inc.</u>,

---

[2] As set forth in defendants' response and corroborated by the affidavit of James R. Lahti, the president and CEO of Affiliated Investment Group, Inc., a company engaging in the equipment leasing business, an equipment lease usually involves three parties:

> (1) the manufacturer or distributor of the equipment to be leased, commonly referred to as the "vendor," (2) the business seeking to acquire the equipment for use, commonly referred to as the "lessee" once a lease agreement is reached, and (3) a leasing company who is willing to bear the financial risk by purchasing the equipment from the vendor and then leasing it to the customer, commonly referred to as the "lessor" once a lease agreement is reached.

<u>Defendants' CIT Financial USA, Inc. d/b/a Lease Finance Group and Lease Finance Group LLC's Briefing on Their Motion to Compel Arbitration</u>, docket #18 at page 4 and <u>Declaration of James R. Lahti</u> attached to the Briefing at Exhibit A, page 2, item 8.

> As Mr. Lahti further explains in his affidavit:

> Many manufacturers and distributors of commercial equipment do not provide seller financing for their products. For various tax and accounting reasons, many buyers prefer to obtain the use of equipment for their businesses by leasing them for a term. A number of financial institutions, including CIT, provide lease financing to businesses.

> In the customary equipment lease transaction, a customer offers to lease the equipment from a leasing company such as CIT. If the leasing company accepts, the leasing company purchases the equipment from the vendor and leases it to the lessee. To protect themselves from scams and incomplete transactions, leasing companies customarily do not authorize the vendor to act on their behalf so that the leasing company is not bound to the lease until it can confirm (1) that the lessee is creditworthy for the size of the financial transaction called for in the lease, (2) that the equipment is real and has been or is going to be installed at the lessee's place of business, and (3 that all other business terms of the lease (e.g., an arbitration clause) are acceptable to the leasing company.

> * * * *

> It is a customary business practice in the equipment leasing industry for leasing companies not to authorize vendors to act on behalf of the leasing companies. This is done for the protection of the leasing company as well as the lessee. Leasing companies do not want vendors or their representatives negotiating side deals or variations from written lease documents. Leasing companies want to be able to rely completely upon the terms set forth on the written lease agreement. For this reason, it is customary to include a statement on the face of the lease document that neither the vendor nor the vendor's representatives are agents for the leasing company, so that the lessee understands that the vendor's representatives do not speak for the leasing company and are not representatives of the leasing company.

<u>Affidavit of James Lahti</u> at pages 2-4, items 9, 10, & 13.

695 F.2d 940, 945 (5th Cir.) (to hold principal liable under apparent agency theory party "must establish that it has been induced to act in good faith upon certain representations made to it by the principal"), cert. denied, 464 U.S. (1983).

While the Court recognizes the inconvenience of and expense of arbitration, business people in the modern era need carefully to understand the legal and practical implications of contracts which they sign. In a more simple time, business dealings were accomplished on a handshake. Times have changed.

Accordingly, IT IS HEREBY ORDERED that Defendants' Motion to Compel Arbitration (docket numbers 3, 4 & 5) is GRANTED such that this case is referred to arbitration pursuant to the terms contained in the Non-Cancellable Lease entered into by the parties under the American Arbitration Association in Chicago, Illinois. IT IS FURTHER ORDERED that this case is ADMINISTRATIVELY CLOSED pending completion of the arbitration.

It is so ORDERED.

SIGNED this _13_ day of September, 2007.

FRED BIERY
UNITED STATES DISTRICT JUDGE